IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| ANDREW DAVID CONNER, | CV 15-00081-H-DLC-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| WARDEN LEROY KIRKEGARD, et al., | |
| Defendants. | |

Plaintiff Andrew Conner filed a Complaint pursuant to 42 U.S.C. § 1983 alleging Defendants utilized excessive force when they utilized OC spray during a cell extraction even though Mr. Conner has asthma. (Doc. 2.) Defendants filed Motions for Summary Judgment arguing there are no genuine disputes of facts material to Mr. Conner's allegations and they are entitled to judgment as a matter of law. (Docs. 64, 66.) Mr. Conner opposes the motions. (Doc. 73.)

Based on the sworn testimony and primarily the video of the cell extraction at issue there is no genuine dispute as to any material fact and the Court finds that the IPS Defendants did not use excessive force on January 30, 2015. The motions for summary judgment should be granted and this matter dismissed.

## I.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*,

477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 447 U.S. at 248.

3

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  But it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided August 4, 2017 (Docs. 69, 70), Mr. Conner was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II.  FACTS[1]

Mr. Conner has been an inmate at Montana State Prison (MSP) since December 11, 2014.  (Statement of Undisputed Facts, Doc. 68 ("SUF") at ¶¶ 1, 2.)

---

[1]The facts taken from Defendants' Statement of Undisputed Facts (Doc. 30) are deemed undisputed unless contradicted elsewhere in the record.  Mr. Conner failed to file a statement of disputed facts as required by Local Rule 56.1(b).  *See* L.R. 56.1(d)("Failure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute.")

On January 30, 2015, while preparing for the 1:00 p.m. count, Sergeant Phillpott heard someone in the Martz Diagnostic Intake Unit (MDIU) B block kicking his cell door and yelling.  (SUF at ¶ 13.)  Sergeant Phillpott went onto B Block and saw Mr. Conner pounding on his cell window.  (SUF at ¶ 14.)  Mr. Conner and his cellmate Christopher Lone Elk were housed in Upper Bravo 12. (SUF at ¶ 15.)  Sergeant Phillpott approached Mr. Conner's cell and asked what was wrong.  (SUF at ¶ 16.)  Mr. Conner told Sergeant Phillpott he wanted his property.  (SUF at ¶ 17.)  Sergeant Phillpott informed Mr. Conner that she was unable to get Mr. Conner's property at that time because the staff was preparing for count.  (SUF at ¶ 18.)  Sergeant Phillpott told Mr. Conner to use his milk carton, which was provided with his lunch, until she could provide him with a cup after count was complete.  (SUF at ¶ 19.)

Mr. Conner kicked and punched his cell door.  (SUF at ¶ 20.)  Sergeant Phillpott ordered Mr. Conner to "cuff up" three times.  (SUF at ¶ 21.)  When an inmate is instructed to "cuff up," he is to back up to the door of his cell and place his open hands, palms up, through the food tray slot in his door.  (SUF at ¶ 22.) The inmate's hands must be open so that staff can visually confirm that the inmate is not in possession of a weapon he could use to hurt staff or other inmates once outside his cell.  (SUF at ¶ 23.)  Mr. Conner did not comply with Sergeant

5

Phillpott's orders.  (SUF at ¶ 24.)  Based on Mr. Conner's aggressive behavior and failure to comply with direct orders, Sergeant Phillpott called command post and requested that the Inner Perimeter Security (IPS) team conduct a cell extraction. (SUF at ¶ 26.)  The IPS team is specially trained to conduct cell extractions.  (SUF at ¶ 27.)  Lieutenant Larry Lakel, who was staffing the command post, determined force was necessary to prevent injury to Mr. Conner and his cell mate, to maintain security, and because Mr. Conner had refused several orders.  (SUF at ¶ 28.) Lieutenant Lakel called the IPS team and ordered them to conduct a cell extraction.  (SUF at ¶ 29.)

The MSP use of force procedure is set forth in MSP Procedure No. 3.1.8 and the policies regarding the use of chemical agents, such as oleoresin capsicum ("OC") spray, also known as pepper spray, and taser deployments, are set forth in MSP Procedure Nos. 3.1.8A and 3.1.8B. (SUF at ¶ 30.)  MSP Procedure 3.1.8 provides:  "In a planned use of force situation, medical information should be considered prior to using inflammatory or chemical agents."  (SUF at ¶ 31.)  "This is done to determine whether the inmate has a disease or condition that would be seriously aggravated if the agent were used."  (SUF at ¶ 32.)

At 12:45 p.m., Lieutenant Larry Lakel called the infirmary and received medical clearance for the use of OC spray.  (SUF at ¶ 33.)  Lieutenant Lakel

relayed to the IPS team that Mr. Conner and Mr. Lone Elk were medically cleared for OC spray.  (SUF at ¶ 34.)

While waiting for IPS to show up, Mr. Conner blocked his cell door with mattresses, began flooding his cell, made toilet paper wads and stuck them to the window, and threw butter and other canteen items around his cell.  (SUF at ¶ 35.) Inmates often flood their cells and cover the floor with shampoo to make it slippery and thus more difficult for IPS to conduct an extraction.  (SUF at ¶ 36.)

The uniformed IPS Team, led by Sergeant Sweeney, responded to Upper Bravo 12 in the MDIU at the direction of Lieutenant Lakel.  (SUF at ¶ 37.)  Once the IPS team arrives on scene, they become the primary responders to a situation and act according to their standard protocols.  (SUF at ¶ 38.)  When IPS arrived, Mr. Conner and his cellmate had covered their faces and bodies with clothing to defeat a taser or OC spray.  (SUF at ¶ 39.)  When the IPS team approached Mr. Conner's cell, Sergeant Sweeney ordered Mr. Conner and Mr. Lone Elk to cuff up. (SUF at ¶ 40.)  Neither inmate complied with Sergeant Sweeney's order.  (SUF at ¶ 41.)  The IPS team then left the block to put on their protective gear and prepare for a cell extraction.  (SUF at ¶ 44.)

The MSP Use of Force Procedure defines the "Use of Force Control Continuum" as "the application of progressive levels of force to gain control of an

7

inmate, starting with passive counter measures up to and including deadly force. Use of force will be limited to the amount to force necessary to control the situation." (SUF at ¶ 45.) Attached to MSP Procedure 3.1.8 is the DOC Control Continuum, which delineates the continuum of force in order of level of force. (SUF at ¶ 46.) The DOC Control Continuum indicates that, when possible, MSP officials should start with a showing of presence and verbal commands to get an inmate to comply. (SUF at ¶ 47.) If that is unsuccessful, the Control Continuum directs MSP officials to use either soft or hard "empty-handed" techniques, which are techniques designed to control either low levels of resistance or less lethal aggression/assaults against an officer/staff. (SUF at ¶ 48.) If the "empty-handed" techniques are either unavailable or unrealistic, then MSP officials are authorized to use "intermediate weapons" such as restraints, chemical agents, or conductive energy devices. (SUF at ¶ 49.)

The Control Continuum specifically states that "[s]taff may enter the continuum at any level that represents a reasonable response to the perceived threat posed by the subject." (SUF at ¶ 50.) In addition, MSP Procedure No. 3.1.8A provides that OC spray may be used to "assist in controlling an acting out inmate," and details the training requirements that staff who use OC spray must successfully complete prior to using the product. (SUF at ¶ 51.)

At approximately 1:10 p.m., on January 30, 2015, the IPS team reentered Mr. Conner's cell block to perform an extraction.  (SUF at ¶ 52.)  The IPS team was wearing extraction gear, and Lieutenant Robert Harmon began recording the extraction with a video camera.  (SUF at ¶ 53.)  As the IPS team approached Mr. Conner's cell, Mr. Conner yelled, "Fuck you."  (SUF at ¶ 54.)  Sergeant Sweeney again ordered both inmates to cuff up.  (SUF at ¶ 55.)  Mr. Conner said, "You want us to cuff up?" then shook his fist and again yelled, "Fuck you."  (SUF at ¶ 56.)  Sergeant Sweeney opened the food slot and CO Short used a broom to clear the items blocking it.  (SUF at ¶ 57.)  At this point, "empty-handed" techniques were unavailable and unrealistic given that this was a cell extraction and there were two inmates in the cell.  (SUF at ¶ 58.)  Sergeant Sweeney thus moved to the next available step in the Continuum of Force by administering OC spray.  (SUF at ¶ 60.)  Once the slot was cleared, Sergeant Sweeney sprayed four short bursts of OC into the cell.  (SUF at ¶ 61.)  Because both inmates were covering their faces with clothing, Sergeant Sweeney sprayed one short burst at Mr. Conner, one short burst at Mr. Lone Elk, and two short bursts in the air.  (SUF at ¶ 62.)  At no point prior to IPS spraying OC did Mr. Conner comply with any of the orders to cuff up.  (SUF at ¶ 63.)  After Sergeant Sweeney sprayed OC, Officer Cales placed his shield over the food slot for approximately 15 seconds.  (SUF at ¶ 64.)  Sergeant

Sweeney then ordered both inmates to lay face down on the ground.  (SUF at ¶ 65.)  Both inmates complied with Sergeant Sweeney's order.  (SUF at ¶ 66.)

The inmates' compliance allowed the IPS team to enter the cell with little force and restrain both inmates.  (SUF at ¶ 66.)  CO Short and CO Kent restrained Mr. Conner.  (SUF at ¶ 67.)  CO Cales and CO Fosness went into the cell with a shield and applied the shield to Mr. Lone Elk.  (SUF at ¶ 68.)  Once Mr. Conner was secured, CO Short and CO Kent removed Mr. Conner from the cell.  (SUF at ¶ 69.)  CO Short and CO Kent then escorted Mr. Conner to the MDIU showers to decontaminate him by rinsing the OC spray off his face and body.  (SUF at ¶ 70.)  CO Cales and CO Fosness restrained Mr. Lone Elk and removed him from the cell.  (SUF at ¶ 71.)  COs Cales, Fosness, and Sweeney then escorted Mr. Lone Elk to the shower.  (SUF at ¶ 72.)

Mr. Conner was in the shower within three minutes of being sprayed.  (SUF at ¶ 73.)  Immediately after being decontaminated in the shower, Mr. Conner was assessed by MSP Registered Nurse (RN) Bruce Squires.  (SUF at ¶ 74.)  Mr. Conner was seen by RN Squires less than four minutes after Sergeant Sweeney sprayed the first burst of OC into Mr. Conner's cell.  (SUF at ¶ 75.)  Mr. Conner complained of an asthma attack, so RN Squires fetched an albuterol inhaler and administered two puffs to Mr. Conner.  (SUF at ¶ 76.)  Mr. Conner himself

10

indicated the inhaler stopped his alleged asthma attack.  (SUF at ¶ 77.)

An asthma attack occurs when symptoms of asthma are exacerbated and a patient's airways become tightened, inflamed, and produce extra mucus, making it difficult to breathe.  (SUF at ¶ 78.)  Most patients experiencing an asthma attack experience shortness of breath or difficulties breathing.  (SUF at ¶ 79.)  Asthma attacks range from mild to severe.  (SUF at ¶ 80.)  Severe attacks are much more rare than mild.  (SUF at ¶ 81.)  During a severe attack, the patient often struggles for breath, wheezes, and feels panicked. (SUF at ¶ 82.)  A patient experiencing a severe asthma attack typically is unable to speak in full sentences or at a high volume.  (SUF at ¶ 83.)  RN Squires examined Mr. Conner and checked his vitals, oxygen saturation, breathing, and ability to speak.  (SUF at ¶ 84.)  Oxygen saturation is one way to measure the severity of an asthma attack. (SUF at ¶ 85.)  It is extremely rare for a person to have an oxygen rate of 100%; a typical oxygen saturation rate is between 94—97%, with 97% considered "excellent."  (SUF at ¶ 86.)  Oxygen saturation usually is much lower than 97% when a patient is experiencing a severe asthma attack.  (SUF at ¶ 87.)

Mr. Conner was verbally loud, yelling and cursing at times.  (SUF at ¶ 88.) He was not audibly wheezing or obviously struggling to breathe.  (SUF at ¶ 89.) Although Mr. Conner's initial oxygen saturation was 86—88%, it immediately

11

improved to 97% when he straightened his upper torso so his lungs could fill more easily.  (SUF at ¶ 90.)

Typically, when a person is sprayed with OC, he or she will complain of burning eyes and skin and will have a runny nose, be coughing, and be breathing through the mouth.  (SUF at ¶ 91.)  A person sprayed with OC also may experience closing of the eyelids, swelling of the lining of the throat, burning and swelling sensations to the mucous membranes, inflammation of the skin similar to a burn, and temporary loss of muscle coordination.  (SUF at ¶ 92.)  These symptoms usually resolve within 24 hours.  (SUF at ¶ 93.)  Inmates who are sprayed with OC tend to yell that they are in pain and yell at the corrections officers who spray them.  (SUF at ¶ 94.)

RN Squires, who attended to Mr. Conner within minutes of the extraction, noted Mr. Conner's discomfort was relatively mild.  (SUF at ¶ 95.)  Mr. Conner did not exhibit any signs of injury abnormal to what a person typically experiences after being sprayed with OC.  (SUF at ¶ 96.)  After observing no serious medical issues, RN Squires cleared Mr. Conner to go to locked housing.  (SUF at ¶ 97.)  Mr. Conner did not exhibit signs of respiratory distress when RN Squires cleared him to go to Locked Housing.  (SUF at ¶ 98.)  Once Mr. Conner was fully assessed and cleared by medical staff, CO Short and CO Kent escorted him to Locked

Housing Unit 1.  (SUF at ¶ 99.)[2]

Neither Sergeant Phillpott nor any of the IPS Defendants were aware Mr. Conner had asthma until after the extraction took place.  (SUF at ¶ 102.)  Pursuant to the Health Insurance Portability and Accountability Act, MSP staff who are not employed by MSP medical are not allowed to view or learn about an inmate's medical history unless the inmate tells them that information himself.  Mr. Conner never informed Sergeant Phillpott or any of the IPS Defendants that he had asthma until after Sergeant Sweeney administered the OC Spray.  (SUF at ¶ 104.)[3]

## III.  ANALYSIS

In order to succeed on a claim for the use of excessive force in violation of the Eighth Amendment, Mr. Conner must prove that Defendants applied force "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline.  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  Not

---

[2]On October 12, 2017, Defendants filed an Errata and Unopposed Motion for Substitution Regarding Docs. 68, 68-1, 68-4, and 68-10 to correct a misstatement in paragraph 99 of the Statement of Undisputed Facts regarding which officer escorted Mr. Conner to locked housing following his cell extraction.  (Doc. 76.)  That motion will be granted.

[3]The IPS Defendants submitted new evidence and new facts with their reply brief.  It is improper to present new evidence in a reply.  *See Provenz v. Miller,* 102 F.3d 1479, 1483 (9th Cir. 1996)(new evidence in reply may not be considered without giving the non-movant an opportunity to respond).  Mr. Conner has not had an opportunity to respond to the new evidence and sur-replies are prohibited by Local Rule without prior leave of court.  The submission of new evidence and facts also circumvents the requirement that a party file a statement of undisputed facts setting forth each fact on which the party relies to support the motion.  L.R. 56.1.  As such, the IPS Defendants' Reply Brief (Doc. 74) will be stricken and not considered in this analysis.

every malevolent touch by a prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. *Id.* at 9-10. Guards may use force only in proportion to the need for it in each situation. *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

In determining whether the use of force was for the purpose of maintaining or restoring discipline or, rather, for the malicious and sadistic purpose of causing harm, a court may evaluate the need for the application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7. Courts, however, must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices to further institutional order and security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001).

Mr. Conner failed to raise a triable issue as to whether the actions of the IPS Defendants in using OC spray during the January 30, 2015 cell extraction amounted to excessive force. He has not shown that the IPS Defendants applied force "maliciously and sadistically to cause harm," rather than in a good-faith

14

effort to maintain or restore discipline.

Defendants presented undisputed evidence that they needed to use force because Mr. Conner and his cellmate had refused direct orders, had flooded their cell, and placed items in front of their door.  It is undisputed that the use of the OC spray was a minimal use of force in the force continuum.

In his Amended Complaint, Mr. Conner alleged he was compliant and submitted to the order to "cuff up."  (Doc. 9-2 at 2.)  He also alleged that Defendants were aware that he was asthmatic.  *Id.*  However, the video of the cell extraction incident disputes Mr. Conner's allegations.  The video clearly shows Mr. Conner at the door of his cell with his face wrapped in a towel.  Defendants argue this is evidence that Mr. Conner expected the officers to utilize OC spray. He does not explain why he had the towel on his face.  Mr. Conner never informed the officers that he was asthmatic until after the use of the OC spray.  Further, when the officers told him to cuff up, he responded, "you want me to cuff up?" "Fuck you."  It also appears that Mr. Conner raised his hand or fist when he stated this.  Mr. Conner placed himself in this situation.  He and his cellmate flooded their cell, placed items in front of the cell door, and wrapped their heads with towels in anticipation of the use of OC spray.  Based upon the undisputed evidence from the video of the incident, it is clear that the use of force was

15

appropriate.

Mr. Conner argues that Defendants should be liable for using OC spray on him even though he had asthma. The Eighth Amendment protects prisoners from inhumane conditions of confinement and is violated when prison officials act with deliberate indifference to a substantial risk of harm to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 828, 833 (1994). It is undisputed that prison staff followed policy and received medical clearance for the use of OC spray on Mr. Conner. (SUF at ¶¶ 31-34.) Prior to the cell extraction, the IPS Defendants were told that Mr. Conner and his cellmate were medically cleared for OC. (SUF at ¶ 34.) It is also undisputed that none of the named IPS Defendants knew that Mr. Conner had asthma until after the OC spray was administered. (SUF at ¶ 102.) In addition, Mr. Conner was in the shower within three minutes of being sprayed and was assessed by medical staff within four minutes of being sprayed. (SUF at ¶¶ 73, 74.) Mr. Conner produced no evidence to suggest that any Defendant was deliberately indifference to a substantial risk of harm to his health or safety. Mr. Conner violated prison rules, he created a dangerous situation, he was non-compliant, and there is no evidence that Defendants knew he was asthmatic prior to the use of the OC spray.

Mr. Conner's supervisory liability claims fail because there was no

underlying constitutional violation.  *Patel v. Maricopa County*, 585 Fed.Appx.

452 (9th Cir. 2014); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799

(1986) (per curiam) ("[N]either *Monell v. New York City Dept. of Social Services*,

436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases

authorizes the award of damages against a municipal corporation based on the

actions of one of its officers when  . . .  the officer inflicted no constitutional

harm.")

Even if there were a basis for liability, the Court finds that policies were in

place to medically clear an inmate prior to the planned use of OC spray.  Those

policies were followed in this case.  There is no evidence that Mr. Conner's

constitutional rights were violated in this case and there is no basis upon which to

find supervisory liability.

Based upon the foregoing, the Court issues the following:

**ORDER**

1.  Defendants' Errata and Unopposed Motion for Substitution

Regarding Docs. 68, 68-1, 68-4, and 68-10 (Doc. 76) is GRANTED.

2.  The IPS Defendants' Reply in Support of Summary Judgment and all

evidence attached thereto (Doc. 74) is STRICKEN.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motions for Summary Judgment (Docs. 64, 66) should be GRANTED and this matter DISMISSED.  The Clerk of Court should be directed to close the case and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  No reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

---

[4]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Conner is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 16th day of October, 2017.


*/s/ John Johnston*
John Johnston
United States Magistrate